**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 21-14137-CIV-CANNON/Maynard**

**SIDNEY SWARTZ**,

      Plaintiff,

v.

**INTERVENTIONAL REHABILITATION**
**OF SOUTH FLORIDA, INC.**,

      Defendant.

_____/

<u>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

**THIS CAUSE** comes before the Court upon Defendant's Motion for Summary Judgment [ECF No. 26], filed on December 22, 2021.  The Court has reviewed Plaintiff's Response in Opposition [ECF No. 32], Defendant's Reply [ECF No. 36], and the full record.  For the reasons that follow, Defendant's Motion [ECF No. 26] is **GRANTED**.

**BACKGROUND**

This case arises from an employment dispute between Plaintiff Sidney Swartz, MD ("Dr. Swartz" or "Plaintiff") and Defendant Interventional Rehabilitation of South Florida, Inc. ("IRSF" or "Defendant").  The material facts viewed in the light most favorable to Plaintiff as the non-moving party are as follows.[1]

---

[1] These facts are drawn from the parties' Joint Statement of Undisputed Facts [ECF No. 24]; Defendant's Statement of Material Facts [ECF No. 25]; Plaintiff's Response to Defendant's Statement of Material Facts [ECF No. 33]; Defendant's Reply Statement of Material Facts [ECF No. 35]; and supporting exhibits.

**A.  Complaints of Unprofessionalism filed Against Dr. Swartz**

Beginning in 2015, Dr. Swartz was employed by Defendant IRSF and its predecessor, Mid-Florida Anesthesia Associates, Inc., to provide pain management physician services [ECF No. 24 ¶ 3].  During his tenure, Dr. Swartz was the leading financial producer for the medical practice, and most patients requested Dr. Swartz's services above other physicians in the group [ECF No. 33 ¶ 99; ECF No. 35 ¶ 99].

Despite these positive attributes, Dr. Swartz nonetheless was the subject of several complaints from fellow employees who alleged that Dr. Swartz engaged in unprofessional behavior [ECF No. 25 ¶ 22; ECF No. 33 ¶ 22].

For instance, on October 26, 2018, Jackie Giroux, the Director of Operations for Pain Management, reported concerns about Dr. Swartz to senior management at IRSF, alleging that Dr. Swartz had exhibited "aggressive" and "inappropriate" behavior to fellow employees, including harassing staff by texting "after hours with harassing comments and profanity," "gossiping at work," "demeaning staff," and "creating chaos and fabricating information that negatively affected physicians in the group" [ECF No. 23-21; ECF No. 25 ¶ 20; ECF No. 33 ¶ 20].

In response to these concerns, senior management at IRSF prepared a letter intended to address Dr. Swartz's conduct with coworkers in the workplace [ECF No. 23-26; ECF No. 25 ¶ 21; ECF No. 33 ¶ 21].  The letter, dated November 2, 2018, identified a list of unacceptable behaviors by Dr. Swartz, including "unprofessional behavior" with "explosive outbursts and personal verbal attacks;" "[d]isregard for company policy and compliance on the utilization of noncertified Medical Assistants;" "continued disregard for chain of command and protocol when addressing staff and clinical concerns" despite "multiple conversations addressing this from both Operations and Clinical Leadership"; "refusal to work with staff"; and inappropriate verbal, written, and text

communication to staff and management [ECF No. 25 ¶ 22; ECF No. 33 ¶ 22].   The letter ultimately was never sent to Dr. Swartz [ECF No. 33 ¶ 115; ECF No. 35 ¶ 115].

Then, on June 5, 2019, Dr. Swartz sent an email to Scott Wilson, the HR Business Partner for IRSF, alleging a claim of hostile work environment due to "Ms. Giroux's interpersonal hostilities and inappropriate behavior," and stating that he felt "disrespected," "ostracized from my duties," and "purposely undermined in a vendetta way to force the number one producer to leave this group" [ECF No. 23-9 p. 2].   Dr. Swartz added that "[b]oth Denise Hopf [the Vice President of Operations for Pain Management] and Jackie need to be rained [sic] in," "Jackie should be terminated for all her prior issues and new ones," and "Denice should be demoted or have oversite [sic]" [ECF No. 23-9 p. 2; ECF No. 24 ¶ 33].

In June 2019, in response to Dr. Swartz's June 5, 2019 complaint, Wilson investigated the claim and conducted witness interviews [ECF No. 24 ¶ 34].   The investigation concluded on June 21, 2019, when Wilson issued an Investigation Report finding that Dr. Swartz's hostile work environment claims were "unsubstantiated" [ECF No. 23-27 p. 4].   The Investigation Report concluded that Dr. Swartz "should not be politicking others to go to HR on his behalf," and that Dr. Swartz "needs to refrain from referring to peers and leadership in a negative manner on group emails" [ECF No. 23-7 p. 5].   On June 25, 2021, Dr. Swartz emailed Wilson to express his disagreement with the findings of the Investigation Report, stating that he found it "incredulous that you have found no evidence of intimidation and creation and perpetuation of a 'hostile work environment' for myself and those brave colleagues that have come forth" [ECF No. 23-10 p. 2].

**B.  IRSF Decides to Terminate Dr. Swartz's Employment**

Workplace issues with Dr. Swartz continued from 2018 to 2019 [ECF No. 25 ¶ 12; ECF No. 33 ¶ 12 (not disputing that Dr. Swartz had interpersonal issues with Giroux and Hopf but

noting that he had "ongoing productive dialogue" about the practice)]. On August 14, 2019, Carrie Ladley, the Clinical Nurse Manager, emailed Hopf, stating that she had found multiple blank prescriptions signed by Dr. Swartz in the office [ECF No. 23-12 p. 2]. Ladley noted that blank prescriptions with Dr. Swartz's signature had been discovered "on at least 4 other occasions," with the most recent incident occurring on August 9, 2019 [ECF No. 23-12 p. 2]. Ladley explained that, for each occurrence, she had "notified the office manager, the previous director and[d] Dr. Levine," and that each of these individuals spoke to Dr. Swartz and advised him that leaving signed prescription forms laying around in the office was "inappropriate, unsafe, and prohibited" [ECF No. 23-12 p. 2].

That same day, on August 14, 2019, Hopf forwarded Ladley's email to Dr. Bollimpalli [ECF No. 25 ¶ 57; ECF No. 33 ¶ 57]. In response, Dr. Bollimpalli suggested that the prescription pad issue be included in the agenda for Hopf and Dr. Bollimpalli's weekly call [ECF No. 25 ¶ 57; ECF No. 33 ¶ 57]. The record contains an email calendar entry, dated August 14, 2019, showing that Hopf and Dr. Bollimpalli had a "Weekly Catch-Up" meeting scheduled for August 15, 2019, at 4:30 p.m., along with an agenda attached to the calendar entry with the top item listed as "Dr. Swartz: Clinic concerns/ Rx pads" [ECF No. 23-25 p. 1].

On August 15, 2019, Hopf and Dr. Bollimpalli held their weekly call and discussed Dr. Swartz's clinical concerns and the issue of the unsecured signed prescription pad [ECF No. 23-35; ECF No. 23-30 ¶ 4]; ECF No. 25 ¶ 59; ECF No. 33 ¶ 59]. According to Hopf and Dr. Bollimpalli, they decided during the call that, due to Dr. Swartz's clinical and administrative issues, termination would be best for IRSF [ECF No. 25 ¶ 60]. Both Hopf and Dr. Bollimpalli submitted sworn declarations attesting that the decision to terminate Dr. Swartz's employment was made during the August 15, 2019, weekly call [ECF No. 23-31 ¶¶ 10–11; ECF No. 23-30 ¶¶ 3–5].

The termination decision was made after nearly a year of issues involving Dr. Swartz [ECF No. 25 ¶ 61; ECF No. 33 ¶ 61]. Hopf testified that IRSF had contemplated terminating Dr. Swartz's employment for "the entire year, if not longer" and pinpointed the termination decision to "early August" [ECF No. 23-17 p. 51:13–18]. Additionally, Dr. Marc Levine, the Medical Director for IRSF, testified that "there were just so many complaints [against Dr. Swartz] from so many different people and factions that it became an untenable situation" [ECF No. 23-23 pp. 9–10 (brackets added)]. In terms of timing, Dr. Levine could not recall the exact date when he learned that Dr. Swartz's employment was being terminated but explained as follows:

> I mean I think it just reached an untenable point. So did it happen over an hour? No. Did it happen over a year? No. It probably was days to weeks. And I was not privy to the exact timing. The decision was made above my pay grade. Again, somewhere days, weeks, if I had to say, maybe a month or two it went over. Because this was a building thing over time. This didn't happen overnight.

[ECF No. 23-23 pp. 9–10].

In opposing summary judgment, Dr. Swartz attempts to dispute the date of August 15, 2019, as the date Defendant decided to terminate his employment, suggesting the possibility of a later date [ECF No. 33 ¶ 60 ("For reasons set forth in Plaintiff's Response [ECF No. 32], Plaintiff will prove the decision [to terminate him] was made later."); *see* ECF No. 32 pp. 8–10]. Dr. Swartz does not offer any evidence, however, to rebut the declarations of Hopf and Dr. Bollimpalli—the decisionmakers in this case—that they decided to terminate his employment on August 15, 2019.[2]

---

[2] There is no suggestion in the summary judgment record that any individual other than Hopf and Dr. Bollimpalli made the decision to terminate Dr. Swartz, or that either Hopf or Dr. Bollimpalli lacked the authority to make such a decision. Giroux, Director of Operations for Pain Management, left IRSF in June 2019 [ECF No. 23-20 p. 2], before the August 15, 2019, termination decision.

**C.  Dr. Swartz's Alleged Protected Activity**

Dr. Swartz points to four emails that he argues constituted protected activity for purposes of his retaliation claims under the FCA and Florida's Whistleblower Act [ECF No. 32 p. 9; ECF No. 33 ¶ 60; ECF No. 31-1 p. 12 (October 26, 2018 email); ECF No. 31-1 p. 15 (August 16, 2019 email); ECF No. 31-1 p. 14 (August 20, 2019 email); ECF No. 23-13 p. 3 (August 21, 2019 email)].  As discussed below, the Court determines that none of Dr. Swartz's emails constitutes protected activity under the FCA.  All four emails are described in turn.

In the fall of 2018, Dr. Swartz became concerned that IRSF's policies on scope of practice for medical assistants and scribes were too restrictive and began advocating for IRSF to allow medical assistants and scribes to enter medication orders [ECF No. 24 ¶¶ 16, 19].  On October 26, 2018, Dr. Swartz sent an email to Dr. Srinivas Bollimpalli, the Vice President of Pain Management for IRSF, in which he expressed concerns about imposing upon doctors the burden of writing their own scripts:

> I have read our new policy for Ma directives re notes and scripts. Currently several of our docs do not do notes and do not print scripts. I have been doing most if not all of my patient notes and occasionally creating scripts. Creating scripts is time consuming and totally inefficient to put on the M.d. especially when we are also supervising NP's and Pa's with follow ups, M.R.I. reviews and new patients. There isn't enough time to throw this burden on the M.D. Reviewing the latest policy from our Quality Committee I am interpreting the newest Ma directives as those that are certified can continue to create scripts under my direction as all of their activities fall under my direction anyway by Florida Law.  If this is not the case then I anticipate that we will not be able to comply nor like me will they agree to this policy. I am sorry for not answering this earlier in our Quality forum, but have been busy trying to figure out the various problems our group is having, not to mention adding in new procedures.

[ECF No. 31-1 p. 12].

The purpose of the October 26, 2018 email, Dr. Swartz testified, was to seek clarification on IRSF's medical assistant/scribe policy because he wanted IRSF to be more flexible in allowing

medical assistants to write scripts [ECF No. 24 ¶¶ 21–22].  Dr. Swartz explained that, in October

2018, he was not aware of any individual in the medical practice who was not complying with the

policy [ECF No. 24 ¶ 23].  On November 30, 2018, IRSF updated the medical assistant/scribe

policy so that medical assistants and scribes could enter medication orders [ECF No. 23-34;

ECF No. 23-13].  Dr. Swartz agrees that the revised policy resulted from his conversations with

IRSF management on this issue [ECF No. 24 ¶ 30].

The second alleged instance of protected conduct was an email that Dr. Swartz sent on

August 16, 2019, to Dr. Bollimpalli and Hopf [ECF No. 31-1 p. 15].  In that email, Dr. Swartz

stated that IRSF's new internal policy for scribes and medical assistants was "confusing" and

indicated that there were "potential compliance concerns" with medical assistants filling out

portions of the medical record.  That email is reproduced below in pertinent part:

> The other topic--M.a. scribe duties--is confusing to me as I myself do not
> understand or know our policies. I bring this up because several M.a.'s have
> approached me lately asking what they are supposed to do re chart/patient visit
> documentation. Their concern is that they are filling out parts of the medical record
> that the M.D. is supposed to be doing. It is apparent to me that several physicians
> in our group are doing no charting whatsoever, which based on Quality Care
> Committee dictates and prior issues with Dr. Martinez' office are potential
> compliance concerns. IMHO it would be ideal for all M.a's and physicians to be in
> strict compliance with whatever our policies are. To my understanding this means
> that the physician inputs the Physical Exam, verifies medications, allergies and all
> medical and social history while the M.a. can input data to be verified and do the
> vitals and document HPI.

[ECF No. 31-1 p. 15].

The third instance of alleged protected conduct was an email that Dr. Swartz sent on August

20, 2019, in which Dr. Swartz conveyed to Dr. Bollimpalli his belief that IRSF had a "compliance

problem," because only two physicians were regularly inputting their own data into the medical

record [ECF No. 31-1 p. 14].  That email states, in relevant part:

> And I welcome your input into our scribe duties as I feel we are definitely not complaint [sic] with three physicians inputting their data (soon to be four with Dr. Warsch joining) and two physicians doing their own thing. I believe this is a compliance problem and will be ongoing, not to mention liability as these two physicians can claim that they didn't agree with what was inputted into the chart by their scribe[s]. Ultimately if all our "scribes--fluoroscopic M.a's" can input all our physical exam, and POC then why are the other three of us at Resolute and Dr. Regenbaum and his partners all doing their charting too? Sid.

[ECF No. 31-1 p. 14].

The fourth and final instance of alleged protected conduct was an email that Dr. Swartz sent on August 21, 2019, to IRSF management (including Dr. Bollimpalli and Hopf), in which he suggested that, if a medical scribe rather than a physician entered information into the medical record after a physical exam, then "there is likely embellishment or fraud being done to fill in necessary parts" [ECF No. 23-13 p. 3].  The email states as follows:

> To be clear can the scribe literally fill out the emr physical exam for the physician? And also do POC? I am concerned that when it comes to completely filling out physical exam that Dr. Alvarez and Levine are only telling scribe pertinent positives but the scribe would then have to fill in the "rest" of the physical exam. Otherwise the physical exam is not a full exam so there is likely embellishment or fraud being done to fill in necessary parts of exam and poc or the billing can't be a 99203 or a 99213 or 99214. Honestly it makes no sense to me that we are allowing [sic] this type of physician non attachment to the progress notes/physical exam/Poc. All of the rest of the docs are doing the work in a compliant manner. I feel that Levine and Alvarez must do their own physical exam, poc, and verifications of data as the rest of us are or there is no standard. I appreciate any guidance you may impart.

[ECF No. 23-13 p. 3].

### D.  Defendant Communicates its Decision to Terminate Dr. Swartz's Employment

On August 28, 2019, one week after Dr. Swartz sent his last email raising concerns about the medical assistant/scribe policy, Hopf and Wilson held a call with Dr. Swartz to communicate the earlier made decision that his employment contract was being terminated [ECF No. 24 ¶ 43]. Hopf testified that she coordinated the details of the phone call with Wilson in advance, and the two prepared a script to read during the call to advise Dr. Swartz that "the company has made a

decision to terminate your agreement without cause, pursuant to section 4(b) of your employment agreement" [ECF No. 23-18; ECF No. 23-30 ¶ 5]. Both Hopf and Wilson testified that Dr. Swartz voluntarily resigned before the script was fully read, but Dr. Swartz disputes this, stating that he resigned after the call concluded [ECF No. 25 ¶ 71; ECF No. 33 ¶ 71]. That same day, Dr. Swartz notified Hopf and Wilson via email that he was resigning [ECF No. 23-14]. Dr. Swartz testified that he resigned because he "didn't want a black mark against my name when I was trying to get a job as a physician" [ECF No. 24 ¶ 48].

### E. Procedural History

In March 2021, Dr. Swartz filed a two-count complaint against Defendant, asserting one claim arising under federal law for retaliation in violation of the False Claims Act (FCA), 31 U.S.C. § 3730(h)(2), and one count arising under Florida law for relation in violation of the Florida Whistleblower Act, Fla. Stat § 448.102(3) [ECF No. 1 ¶¶ 38–45].

Defendant now moves for summary judgment on both counts [ECF No. 26].

## LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The Court, in ruling on a motion

for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

"For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal quotation marks omitted). Speculation or conjecture cannot create a genuine issue of material fact.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  The moving party has the initial burden of showing the absence of a genuine issue as to any material fact.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party.  *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e).

## DISCUSSION

Defendant moves for summary judgment as to both counts of Dr. Swartz's Complaint. Defendant argues that Dr. Swartz has failed to show that (1) he engaged in protected conduct within the meaning of the False Claims Act or Florida's Whistleblower Act or (2) that his termination was caused by his alleged protected activity [ECF No. 26 pp. 5–12].  To qualify for protection for retaliation under the False Claims Act, a plaintiff must show (1) that he was engaged in protected conduct and (2) the employer retaliated against him because of that protected conduct. *See Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021); *see also*

10

*Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005). Likewise, to establish a claim under the Florida Whistleblower Act, a plaintiff must show that: "(1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal relation between the two events." *Chaudhry v. Adventist Health Sys. Sunbelt, Inc.*, 305 So. 3d 809, 814–15 (Fla. Dist. Ct. App. 2020) (citation and quotation marks omitted).

The Court agrees with Defendant that Dr. Swartz has failed to show that any of Dr. Swartz's emails, sent on October 26, 2018, and August 16, 20, and 21 of 2019, constitute protected activity under the False Claims Act. The Court determines, however, that Dr. Swartz has shown at least a factual question exists as to whether his August 2019 emails constitute protected activity under the Florida Whistleblower Act. Even so, regardless of Dr. Swartz's protected activity under the Florida Whistleblower Act, and assuming the existence of protected activity in emails sent by Dr. Swartz on August 16, 20, 21 of 2019 for purposes of the False Claims Act, Dr. Swartz's claims still fail because there is no genuine dispute of material fact that Defendant decided to terminate Dr. Swartz before he engaged in any alleged protected conduct.

## A. Protected Activity

### 1. False Claims Act

Protected activity is defined under the False Claims Act as either (1) "lawful acts done by the employee . . . in furtherance of an action under [the False Claims Act]," or (2) "other efforts to stop 1 or more violations of [the False Claims Act]." *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018) (quoting 31 U.S.C. § 3730(h)). Under the first prong, the Eleventh Circuit has explained that the relevant inquiry is whether an employee's "complaints of illegal activity occurred when there was a distinct possibility that she or the government would sue the defendants under the False Claims Act." *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300,

1303–04 (11th Cir. 2010).   The second prong, which defines protected activity as "other efforts to stop 1 or more violations," was added by Congress in 2009 and 2010,[3] but the Eleventh Circuit "has not yet considered what the new language means for would-be plaintiffs." *Hickman*, 985 F.3d at 1288.   Nonetheless, the Eleventh Circuit has held that plaintiffs must, at minimum, "show that the activity they were fired over had something to do with the False Claims Act—or at least that a reasonable person might have thought so." *Id.*   "It is not enough for an employee to suspect fraud; it is not even enough to suspect misuse of federal funds . . . an employee must suspect that her employer has made a false claim to the federal government." *Id.*

Construing the allegations in the light most favorable to Dr. Swartz, Dr. Swartz has failed to show that he engaged in protected conduct under the False Claims Act.   Dr. Swartz cites to four emails that he sent to IRSF management as examples of protected conduct: the October 26, 2018 email, and the emails sent on August 16, 20, and 21 of 2019 [ECF No. 32 pp. 6–8].   In his view, these emails "sounded the alarm about improperly prepared medical records that lead to billing the federal government Medicare program and all other payers" [ECF No. 32 p. 6].   Defendant urges otherwise, arguing that none of the emails alleges any actual false claim to the federal government and therefore does not qualify as protected activity within the meaning of either statute [ECF No. 26 p. 8 (characterizing the emails as "mere[] grumbl[ing] about potential compliance concerns")].

The Court reviews these emails in turn.

First, Dr. Swartz's October 26, 2018 email does not constitute protected conduct under either the FCA or Florida's Whistleblower Act because Dr. Swartz was not objecting to any illegal

---

[3] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1079 A(c), 124 Stat. 1376, 2079 (2010); Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624 (2009).

activity, much less to a false claim for payment to the government. It is undisputed that the purpose of Dr. Swartz's October 26, 2018 email was to seek clarification regarding IRSF's medical assistant/scribe policy and to advocate for a *more* flexible policy than what IRSF allowed [ECF No. 24 ¶¶ 21–22]. Dr. Swartz testified that, at the time he sent the October 28, 2018 email, he was not aware of any individual in the medical practice who was not complying with IRSF's policy [ECF No. 24 ¶ 23]. Indeed, Dr. Swartz agrees that, when IRSF issued a revised policy for medical assistants, it was "put in place as a result[] of the conversations he was having about [medical assistants] and their compliance with Florida Law" [ECF No. 24 ¶ 30 (brackets added)]. The October 28, 2018, email, therefore, does not constitute protected activity, because Dr. Swartz did not object to any alleged unlawful practice at the time, much less a submission of a false claim to the federal government.

Second, Dr. Swartz's August 2019 emails are slightly more concrete in their reference to "compliance" concerns in general, but they too do not contain any allegation that his employer had submitted false claims for payment to the federal government [ECF No. 31-1 pp. 14, 15; ECF No. 23-13 p. 3]. As quoted above, the emails reference "compliance" concerns related to physicians failing to fill out medical records and leaving that work for medical assistants/scribes. They do not, however, reference submitting false claims for payment to the government, the FCA, or any other federal program or federal or state law. The closest reference in the emails to a possible violation of law is a statement in the August 21, 2019 email that there is "likely embellishment or fraud being done to fill in necessary parts of exam and poc or the billing can't be a 99203 or a 99213 or 99214" [ECF No. 23-13 p. 3].[4] Even that reference, however, does not

---

[4] This is consistent with Dr. Swartz deposition testimony in which he stated his belief that (1) IRSF's policy regarding medical assistants/scribes could lead to "fraud"; and (2) "I think I was

speak in any discernable way to the submission of a false claim for payment to the federal government.  As the Eleventh Circuit has stated, it is not enough for an employee to "suspect fraud" or "suspect misuse of federal funds."  *Hickman*, 985 F.3d at 1288.  Rather, "an employee must suspect that her employer has made a false claim to the federal government," *id.*, and in this case, as best the Court can tell, the record does not satisfy that standard under the False Claims Act.

### 2.  Florida Whistleblower Act

As to whether Dr. Swartz engaged in protected activity for purposes of the Florida Whistleblower Act, taking the evidence in the light most favorable to Dr. Swartz, there is record evidence as to the August 2019 emails only that Dr. Swartz at least held a "good faith, objectively reasonable belief" that Defendant's medical assistant/scribe policies violated the law.  *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Dist. Ct. App. 2013).

Under the Florida Whistleblower Act, for a plaintiff to show he engaged in protected activity, the plaintiff must show that he "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."  Fla. Stat. § 448.102(3).  The Florida Whistleblower Act defines "law, rule, or regulation" as "any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business."  Fla Stat. § 448.101(4).

Florida appellate courts disagree about what an employee must show to establish that he engaged in protected activity.  *Compare Aery*, 118 So. 3d 904 (holding that all an employee must show is "'a good faith, objectively reasonable belief that h[is] activity is protected by the statute'")

---

fired as a result of the corporation not wanting to do compliance and not wanting to do the right thing" [ECF No. 31-2 pp. 174, 179].

(quoting *Luna v. Walgreen Co.*, 575 F. Supp. 2d 1326, 1343 (S.D. Fla. 2008)), *with Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 465 (Fla. Dist. Ct. App. 2015) (disagreeing with *Aery* and stating in dicta that an employee "must prove that he objected to an actual violation of law or that he refused to participate in activity that would have been an actual violation of law"). "[T]he Florida Supreme Court has not resolved the disagreement." *Butterfield v. JetBlue Airways Corp.*, No. 20-13473, 2022 WL 291003, at *5 (11th Cir. Feb. 1, 2022).

The Court takes no position on whether Defendant's alleged practices violated the law. Instead, applying the more lenient standard articulated in *Aery*,[5] the Court concludes that Dr. Swartz has shown a factual issue as to whether he had a "good faith, objectively reasonable belief" that he was engaging in protected activity for purposes of the Florida Whistleblower Act when he complained to IRSF management in August 2019 about compliance issues with medical assistants and scribes. Dr. Swartz submitted a sworn declaration, in which he averred that "[i]t was clear to me over time that both Dr. Levine and Dr. Alvarez were using either the medical Assistants or a registered nurse to do their charting, using their passwords and thus create[ing] billing fraud" [ECF No. 31-1 ¶ 20]. This parallels Dr. Swartz's deposition testimony, where he was asked whether it would violate the law for a physician to "have his medical assistant fill out the notations in the medical record"—as Dr. Swartz alleged was occurring at IRSF—and in response to which Dr. Swartz stated: "I do believe that that would be fraud" [ECF No. 31-2 pp. 173–174]. Construed in the light most favorable to Dr. Swartz, therefore, his August 2019 emails show that he was concerned with at least some compliance failure at IRSF, which he believed could lead to "embellishment or fraud" [ECF No. 23-13 p. 3].

---

[5] *See Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328, 1340 n.6 (S.D. Fla. 2017) ("*Aery* remains the controlling law on the issue because the discussion concerning the actual violation standard in *Kearns* was only in dicta.").

On this record, the Court determines that—for purposes of the Florida Whistleblower Act only—Dr. Swartz has shown at least a factual question as to whether he had a "good faith, reasonable belief" that he was engaged in protected activity. *See Aery*, 118 So. 3d at 916 (holding that an employee who "immediately and repeatedly" reported concerns to his employer about alleged illegal conduct had shown a good faith, objectively reasonable belief that he was engaged in protected activity, and explaining that it was "not necessary that [the plaintiff] provide his employer with statutory and case law citations to support his claim of illegal conduct"); *see also Ritenour v. AmeriGas Propane, Inc.*, No. 18-CV-80574, 2019 WL 2008675, at *7 (S.D. Fla. Mar. 15, 2019) (applying *Aery* and concluding that a plaintiff held an objectively reasonable belief that his employer was engaged in a violation of the law based upon the plaintiff's testimony that his employer was "blatantly ripping off customers" and engaged in conduct the plaintiff believed to be "freaking illegal"). Accordingly, for purposes of the Florida Whistleblower Act only, the Court determines that Dr. Swartz has at least shown the existence of a factual question as to whether he engaged in protected activity by sending his August 2019 emails.

## B. Causation

Regardless of whether Dr. Swartz engaged in protected activity within the meaning of the False Claims Act or Florida's Whistleblower Act, Plaintiff's retaliation claims still fail because the undisputed record evidence establishes that Defendant's decision to terminate Dr. Swartz preceded any alleged protected conduct.

A "but-for causation standard applies to claims under the antiretaliation provision of the False Claims Act just as it does to the antiretaliation provision of Title VII and the antidiscrimination provision of the ADEA." *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359

(11th Cir. 2020); *see Chaudhry*, 305 So. 3d at 817 (holding that a "but-for" causation standard also applies when analyzing retaliation claims under the Florida Whistleblower Act).

     "In order to prevail on a retaliation claim, a plaintiff must establish the requisite causal connection between [his] statutorily protected conduct and the adverse employment action." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999).  "To establish that causal connection, a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'"  *Id.* (quoting *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)).  At a minimum, however, "[t]o establish the necessary causal connection under § 3730(h)(1), the plaintiff must show that the employer was at least aware of the protected activity." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (citing *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).  "This minimum proof stems from the important requirement that 'the employer was actually aware of the protected expression at the time it took adverse employment action.'"  *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)).  A plaintiff must present more than "mere curious timing coupled with speculative theories." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997).

     Defendant argues that summary judgment is warranted in its favor because the "undisputed facts show that IRSF made the decision to terminate Dr. Swartz prior to his August 2019 complaints[,] which he claims constitutes his protected activity in this matter" [ECF No. 26 p. 5 (brackets added)].[6]  The record, construed in a light most favorable to Dr. Swartz, confirms this

---

[6] Defendant initially took the position that no adverse action occurred because Dr. Swartz voluntarily resigned during the phone call with Hopf and Scott Wilson—before they could tell him that he was being terminated [ECF No. 26 pp. 3–5].  Dr. Swartz challenged this assertion in his Response in Opposition, arguing that both Hopf and Wilson testified that they had no recollection whether Dr. Swartz verbally resigned during the phone call [ECF No. 32 pp. 3–6]. Defendant did

timeline of events.  On August 14, 2019, Hopf and Dr. Bollimpalli scheduled a meeting for August 15, 2019, at 4:30 p.m. to discuss the issue of Dr. Swartz's signed prescription pads [ECF No. 23-25 p. 1].   On August 15, 2019, Hopf and Dr. Bollimpalli held their weekly call, discussed Dr. Swartz's clinical concerns and the issue of the signed prescription pad, and then decided to terminate Dr. Swartz's employment [ECF No. 23-35; ECF No. 23-30 ¶ 4]; ECF No. 25 ¶ 59; ECF No. 33 ¶ 59].  Both Hopf and Dr. Bollimpalli submitted sworn declarations that the decision to terminate Dr. Swartz's employment occurred during the August 15, 2019, weekly call [ECF No. 23-31 ¶¶ 10–11; ECF No. 23-30 ¶¶ 3–5], and Dr. Swartz has provided no evidence to rebut these declarations or to otherwise create a triable issue of fact on this issue.[7]

The first instance of Dr. Swartz's alleged protected activity occurred one day after the termination decision, on August 16, 2019, when Dr. Swartz emailed Dr. Bollimpalli regarding Dr. Swartz's "confusion" about IRSF's internal policy for scribes and medical assistants [ECF No. 31-1 p. 15].   Thus, Defendant could not have been aware of Dr. Swartz's alleged protected activity because his email was sent after the date on which the record evidence

---

not respond to Dr. Swartz's challenge on this point in its Reply.  The Court accepts that Plaintiff's termination constitutes an adverse action within the meaning of the FCA and Florida's Whistleblower Act.

[7]  It bears noting that Dr. Swartz does not directly challenge Defendant's assertion that the termination decision was made on August 15, 2019 [ECF No. 26 p. 6; ECF No. 32 pp. 8–10].  At most, Dr. Swartz insinuates that, because the termination decision was not implemented until August 28, 2019, and because Hopf and Dr. Bollimpalli met every Wednesday, a jury "might well conclude that the decision to terminate Dr. Swartz was made on Wednesday, August 21, 2019"— after the last of Dr. Swartz's emails about medical billing [ECF No. 32 pp. 7–8].  Other than speculating about when the termination decision occurred, however, Dr. Swartz does not allege any specific facts or offer evidence to rebut the sworn declarations of Hopf and Dr. Bollimpalli, both of whom aver that the termination decision occurred on August 15, 2019 [ECF No. 23-31 ¶¶ 10–11; ECF No. 23-30 ¶¶ 3–5].  *See Cordoba*, 419 F.3d 1181 ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995))).

establishes that Hopf and Dr. Bollimpalli agreed to terminate Dr. Swartz. *See Griffin*, 182 F.3d at 1282 ("[T]he adverse employment action must follow the statutorily protected conduct"); *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (Gorsuch, J.) ("[B]asic principals [sic] of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation.")).

That Defendant waited two weeks to communicate its decision to Dr. Swartz on August 28, 2019, does not change this conclusion.  "When an employer contemplates a given action before the employee engages in a protected activity, however, temporal proximity between that action and the employer's knowledge of the protected conduct alone will not suffice to show causation." *Castillo v. Roche Lab'ys, Inc.*, 467 F. App'x 859, 862 (11th Cir. 2012); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers . . . proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality"); *Vinnett v. Gen. Elec. Co.*, 271 F. App'x 908, 914 (11th Cir. 2008) ("If the decisionmaker lacked notice of the protected activity, there can be no causal connection.  There is also a lack of a causal connection when an employer makes a decision before the protected activity occurs and then proceeds with that decision."); *Nelson v. Americold Logistics, LLC*, No. 18-CV-04846SCJLTW, 2020 WL 1809744, at *4 (N.D. Ga. Feb. 11, 2020), *report and recommendation adopted*, No. 1:18-CV-04846-SCJ, 2020 WL 1799945 (N.D. Ga. Mar. 4, 2020) ("When an employee engages in misconduct that triggers a process leading to his termination, the mere fact that he subsequently engaged in a protected activity does not establish causation.").  On this record, Dr. Swartz cannot show that his termination was causally related to his alleged protected conduct.

Dr. Swartz attempts to overcome the summary judgment record by asserting that a genuine issue of material fact exists "as to when the decision was made because the participants in the

decision testify differently about the length of the termination consideration process" [ECF No. 32 p. 10]. As Dr. Swartz notes, Scott Wilson, the HR representative, testified that he did not recall "when people started talking about terminating Doctor Swartz" [ECF No. 32 p. 8; ECF No. 23-25 p. 57:20–22]; and Dr. Levine testified that he too was unsure of when the decision was made to terminate Dr. Swartz [ECF No. 32 p. 9; ECF No. 23-23 pp. 9–10].

These "conflicting" testimonies do not raise a genuine issue of material fact as to when the termination decision was made by the decisionmakers in this case, Hopf and Dr. Bollimpalli. First, nothing in Wilson's testimony—which simply stated that he did not recall how long the deliberation process took before terminating Dr. Swartz's employment—contradicts the sworn declarations of Hopf and Dr. Bollimpalli, both of whom aver that the termination decision was made on August 15, 2019, after nearly a year of complaints about unprofessional behavior from Dr. Swartz [ECF No. 23-31 ¶¶ 10–11; ECF No. 23-30 ¶¶ 3–5]. Likewise, nothing in Dr. Levine's testimony contradicts Hopf and Dr. Bollimpalli's sworn declarations that the termination decision was made on August 15, 2019. Although Dr. Levine stated that he did not recall the "exact date" when he learned that Dr. Swartz was going to be terminated [ECF No. 23-23 p. 35:16–21], his testimony confirms that the decision was made "because there were just so many complaints from so many different people and factions that it became an untenable situation" [ECF No. 23-23 pp. 9–10]. Dr. Levine testified that the decision was made "somewhere days, weeks, if I had to say, maybe a month or two it went over. Because this was a building thing over time. This didn't happen overnight [ECF No. 23-23 pp. 9–10].

On this record, Defendant has met its burden to show that it is entitled to summary judgment as a matter of law, and Dr. Swartz has failed to raise any genuine issue of material fact to preclude summary judgment. The uncontradicted record shows that the decision to terminate

Dr. Swartz was made on August 15, 2019, and the first plausible instance of Dr. Swartz engaging in protected activity sufficient to raise a claim for retaliation under the False Claims Act or the Florida Whistleblower Act was on August 16, 2019, leaving no room for argument that Defendant was aware of Dr. Swartz's alleged protected acts before it made the decision to terminate him. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."). Summary judgment is warranted in favor of Defendant as to both Counts of Dr. Swartz's Complaint.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** as follows

1. Defendant's Motion for Summary Judgment [ECF No. 26] is **GRANTED**.

2. The Court will enter a separate order of final judgment pursuant to Federal Rule of Civil Procedure 58.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 29th day of March 2022.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record